**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| MOLLIE J. NILES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-CV-38 |
| | ) | |
| MCCI OF INDIANA, LLC, d/b/a | ) | |
| LINCOLNSHIRE PLACE | ) | |
| ASSISTED LIVING, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on the motion for summary judgment filed by Defendant

MCCI of Indiana, LLC, on February 11, 2021 (ECF No. 39). Plaintiff Mollie Niles filed a

response in opposition on April 5, 2021 (ECF No. 45) and MCCI filed a reply brief on May 3,

2021 (ECF No. 49).[1] For the reasons explained below, the motion is GRANTED.

## BACKGROUND

Mollie Niles was employed by Defendant MCCI as a certified nursing assistant ("CNA")

from July 26, 2018, until September 24, 2018. MCCI "owns and operates an assisted living

facility providing dementia care in Fort Wayne, Indiana commonly known as 'Lincolnshire

Place.'" Defendant's Memorandum in Support of Motion for Summary Judgment (ECF No. 40),

p. 2. "MCCI d/b/a Lincolnshire Place employs on-site nurses and other medical staff, including

certified nursing assistants, to provide twenty-four hour per day care to its residents and to

---

[1] The record on summary judgment also includes Defendant's Memorandum in Support
of Summary Judgment and attached exhibits (ECF No. 40), and Plaintiff's Appendix to Brief in
Opposition (ECF No. 46).

appropriately address their emergent and non-emergent medical needs." *Id.* According to MCCI, "Niles did not show up for her scheduled shifts on September 22 and 23, 2018, has no evidence that she called-in her absence for these scheduled shifts and did not provide MCCI with any documentation of any illness or cause for her absence on September 22, and 23, 2018. . . . [and] was terminated . . . on September 24, 2018[,] after she was deemed, in accordance with MCCI's attendance policy, to have voluntarily resigned." *Id.*, p. 4.

Niles contends that her termination was due to her race, Black, and the fact that she was pregnant at the time of her firing. Amended Complaint (ECF No. 21). Niles alleges as follows:

> Plaintiff worked for Defendant from on or about July 26, 2018, until she was terminated on September 10, 2018, although Plaintiff never learned of her termination until January 18, 2019. . . . Complaint was pregnant and conferred with the Defendant, notifying them of her expected delivery date in December 2018–at which time she was assured she would be to return to work after delivering the baby. . . . Plaintiff began to have issues with her pregnancy and provided physician's notes to the Defendant, as she was unable to work some days due to issues she was having. Rather than try to accommodate the Plaintiff's condition, the Defendant simply placed her off work until she had delivered the baby. . . . On or about October 2018, Plaintiff received a phone call from the Director of Nursing asking her when she planned on returning to work, the Plaintiff again states she was still pregnant and would return to work as soon as she had the baby. The Plaintiff had her physician fax a letter to the Defendant, to let them know she would be able to return after the baby was born in December. She was again assured she would be able to return to work. . . . Plaintiff successfully delivered her child on December 20, 2018. Plaintiff called Defendant on or about January 8, 2019, informed them of the delivery and requested to return to work. Plaintiff was informed that she had already been terminated on September 10, 2018, though she had never been informed of this action, and instead had been assured she would be able to return to work. . . . Plaintiff is aware of another similarly situated white employee, who was also pregnant, and who did not lose her job. . . . Plaintiff contends that her termination was due to her race/ethnicity African/American and her sex (pregnant/female), and in retaliation for requesting time off due to her doctor's notes and complications of her pregnancy.

First Amended Complaint, pp. 2-3. Niles "filed a Charge of Discrimination on or about April 10,

2019, Charge No. 470-2019-02238 . . . [.] The EEOC issued a Dismissal and Notice of Right to Sue letter on October, 28, 2019, a copy of which was received by plaintiff's counsel on October 30, 2019[.]" *Id.*, pp. 1-2 (*see* ECF No. 21-1, Charge of Discrimination; ECF No. 21-2, Notice of Right to Sue). Niles filed this lawsuit on January 22, 2020, seeking "compensatory damages, punitive damages, reasonable attorneys' fees and costs[.]" *Id.*, p. 3. She filed her First Amended Complaint, the controlling Complaint in this case, on June 15, 2020.

## STANDARD OF REVIEW

Federal Rule 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Supreme Court has explained that "the burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "'If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial.'" *Simpson v. Gen. Dynamics Ordnance & Tactical Sys.-Simunition Operations, Inc.*, 2019 WL 6912332, at *2 (N.D. Ind. Dec. 19, 2019) (quoting *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015)). Within this context, the Court must construe all facts and reasonable inferences from those facts in the light most favorable to the nonmoving party. *Id.* (citing *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a

trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Summary judgment is

not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Id*.

Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if

genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion,

summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975

F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).

If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish

his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S.

at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

"Summary judgment is a critical moment for a non-moving party. It must 'respond to the

moving party's properly-supported motion by identifying specific, admissible evidence showing

that there is a genuine dispute of material fact for trial.'" *Johnson v. Advocate Health & Hosps.*

*Corp.*, 892 F.3d 887, 893-94 (7th Cir. 2018) (quoting *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562,

568 (7th Cir. 2017)). "Inferences supported only by speculation or conjecture will not suffice."

*Id*. (citing *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721-22 (7th Cir. 2018)). "Neither will the

mere scintilla of evidence." *Id*. (citing *Grant*, 870 F.3d at 571).

The Seventh Circuit in recent years has refined the summary judgment standard of review

in employment discrimination cases, explaining as follows:

> On top of the normal lattice of summary judgment demands, we must also apply
> the constructs of employment discrimination law. For years we have tangled with
> a "rat's nest of surplus tests" in employment discrimination cases–struggling to
> pigeon hole evidence into the direct or indirect method with various overlaying
> requirements of "convincing mosaics" and circumstantial or direct evidence. *Ortiz*
> *v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016). Our Circuit has
> now clarified the singular question that matters in a discrimination case:

"[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . . Relevant evidence must be considered and irrelevant evidence disregarded." *Id.*

*Johnson*, 892 F.3d at 893-94.

## DISCUSSION

### I. Retaliation claim.

Niles alleged in her Amended Complaint that MCCI fired her "in retaliation for requesting time off due to her doctor's notes and complications of her pregnancy." Amended Complaint, p. 3. However, in her response brief "Niles concedes that she has no retaliation claim." Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment (ECF No. 45), p. 2; *id.*, p. 12 ("Plaintiff concedes that MCCI is entitled to summary judgment on her retaliation claim."). Accordingly, summary judgment is granted in favor of MCCI on Niles' retaliation claim.

### II. Race and sex discrimination claims.

Niles alleges that MCCI fired her due to her race and sex. Niles contends that another pregnant employee who was white was allowed to return to her job after giving birth but that Niles was not. Niles argues that MCCI's proffered nondiscriminatory explanation for its decision–that Niles violated the no-call/no-show rule–is pretextual. Plaintiff's Brief in Opposition, generally.

Title VII prohibits an employer from discriminating against an employee based on her race. 42 U.S.C. § 2000e-2(a). The question is whether a reasonable factfinder could find that

Niles was fired because of her race. *See Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020); *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019). A plaintiff may prove discrimination either directly or indirectly. *McKinney v. Off. of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017). Niles relies on the indirect burden-shifting method of proof set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973) and on the holistic approach set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Under the indirect burden-shifting method, Niles must establish a prima facie case of discrimination. *Barnes*, 946 F.3d at 389; *Riley v. Elkhart Community Schools*, 829 F.3d 886, 891–92 (7th Cir. 2016). To establish a prima facie case of race discrimination, Niles must "present evidence that (1) she is a member of a protected class, (2) she was meeting MCCI's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably." *Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019). If Niles can make this showing, the burden shifts to MCCI to produce a legitimate, nondiscriminatory reason for its action. *Barnes*, 946 F.3d at 389. The burden then shifts back to Niles to produce evidence that MCCI's stated reason was pretextual. *Barnes*, 946 F.3d at 389; *Riley*, 829 F.3d at 892.

Niles also alleges sex discrimination based on her pregnancy. "The Pregnancy Discrimination Act amended Title VII to 'clarify that pregnancy discrimination is included in Title VII's prohibition on sex discrimination.'" *Rayford v. La Petite Academy, Inc.*, No. 19-C-7877, 2021 WL 2311968, at *3 (N.D. Ill. June 4, 2021) (quoting *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1154 (7th Cir. 1997)). "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical

conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes[.]" 42 U.S.C. § 2000e.

To establish a claim of sex discrimination, Niles must establish the same elements: "(1) that she was a member of a protected class; (2) that she was performing her job satisfactorily; (3) that she suffered an adverse employment action; and (4) that MCCI treated a similarly-situated individual outside Niles' protected class more favorably." *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012) (citing *Dear v. Shinseki*, 578 F.3d 605, 609 (7th Cir. 2009)). "If [Niles] satisfies those elements, the burden then shifts to [MCCI] to identify a legitimate, nondiscriminatory reason for the action taken." *Id*. (citing *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010)). If MCCI advances a nondiscriminatory reason for terminating Niles, summary judgment would only be erroneous if Niles produced evidence that the proffered reason was a pretext for improper discrimination. *Id.*

There is no dispute that Niles establishes the first and third prongs of both her race and sex claims; she was, after all, a pregnant Black woman who was fired. But MCCI argues that Niles fails to establish a prima facie case of either race or pregnancy discrimination because she cannot show that she was meeting the company's reasonable expectations or that any similarly situated CNA was treated more favorably. MCCI further contends that Niles fails to present evidence that MCCI's explanation for its decision to fire her was pretextual. According to MCCI:

> The undisputed facts in this case leave Niles unable to establish two of the four prima facie elements required by *McDonnell Douglas* to support claims of race or pregnancy/gender discrimination. First, Niles cannot establish that she was performing reasonably on the job in accordance with MCCI's legitimate expectations at the time of her termination. Second, Niles cannot establish that there are similarly situated employees who were not of her race and/or who were not pregnant that MCCI treated more favorably. These deficiencies alone should

be fatal to Niles' race and pregnancy/gender claims. Even if she were allowed to proceed despite these deficiencies, however, Niles has no record evidence upon which to establish that MCCI's legitimate, non-discriminatory termination of Niles for violation of its Attendance policy and No Call/No Show rule were pretextual or that anything about her termination was discriminatory.

Defendant's Memorandum in Support, pp. 10-11.

MCCI argues that Niles cannot show that a similarly situated employee was treated more favorably and therefore she fails to establish a prima facie case of either race or sex discrimination. MCCI also argues that even if Niles could establish a prima facie case for either claim, her case fails anyway because she cannot show that MCCI's proffered, nondiscriminatory explanation for its decision was pretextual.

### A. Niles fails to establish that a similarly situated employee was treated more favorably.

Niles claims that "[a] coworker, Autumn, was pregnant around the same time Plaintiff was, but Autumn was allowed time off work for complications without being terminated, and Plaintiff was not." Plaintiff's Response, p. 6 (citing Plaintiff's Deposition, pp. 92-93). She states that "[e]ven though I was told to stay off of work due to my high-risk pregnancy, Lincolnshire threatened to terminate me on or about September 3, 2018[,] if I did not come back into work, but I became aware of another employee, Autumn Smith (a White/Caucasian female), who was pregnant with complications, but she was allowed to return to her job after giving birth and I was not." *Id.*, pp. 3-4 (quoting Plaintiff's Affidavit, Exhibit A, (ECF No. 46-1)). Niles concludes that "[b]asically, a Caucasian coworker who had taken time off of work was allowed her time off and was not terminated like I was." *Id.*, p. 4. Niles writes in her brief that during her deposition she "recalled that a female Caucasian by the name of Autumn Smith was permitted time off for

pregnancy complications without being terminated." *Id*., p. 5 (citing Plaintiff's Deposition, attached to Defendant's Motion for Summary Judgment as ECF No. 40-2). Niles actual testimony was that "[t]here was another woman that was there that was pregnant. Her name was Autumn. And she had her baby in, I want to say December, same–around the same time I had my child, and she came back in February. They let her come back in February." Plaintiff's Deposition, pp. 71-72.

Niles argues that Autumn Smith was similarly situated but was treated more favorably because Smith is White. As MCCI notes, even if true, this argument would support only Niles' race discrimination claim, but not her sex discrimination claim, since Smith is also female and was pregnant. As MCCI correctly notes, "[e]ven if this Court were to accept Niles' alternate conception of what should be considered "similarly situated" in this context, which it should not based on the language and case law cited herein, Niles' use of Autumn as a similarly situated employee could only support her Title VII race claim and not her pregnancy claim because Autumn was also pregnant." Defendant's Reply, p. 7, n. 3. And Autumn Smith is the *only* other MCCI employee whom Niles argues was similarly situated as to *either* claim. In any event, MCCI contends that Smith was *not* similarly situated and that Niles' attempt to characterize her as such ignores the evidence and misrepresents the facts. MCCI, making no bones about it, argues as follows:

> During discovery in this case, Niles propounded and MCCI responded to discovery revealing that there were at least 12 employees other than herself who, during the period from April 2018 to January 2019, MCCI also deemed to have voluntarily resigned and terminated pursuant to the No Call/No Show rule in its Attendance policy. Niles did not pursue discovery further relating to these individuals. However, as set forth in paragraph 10 of the signed, verified Affidavit of Tyler Weilbaker (attached to this Memorandum as Exhibit A) there were eight

> Caucasians and no other pregnant individuals among them.
>
> Apparently failing to conceive of other employees who were also terminated for being no-call/no-shows as "similarly situated" to her, Niles alleged and testified at her deposition that the only individual she considered to be "similarly situated" to her was Autumn Smith ("Smith"), a Caucasian pregnant MCCI employee whom Niles allegedly learned from a coworker took a leave surrounding her pregnancy and then later returned to work. (SOF, ¶19) Niles, who self-identifies as multi-racial, asserts that MCCI's willingness to return Smith to work following her pregnancy while not reinstating Niles following her pregnancy somehow establishes race discrimination. What Niles blatantly ignores in making this assertion, however, is her admitted lack of any knowledge or evidence whatsoever that Smith ever, as Niles did on September 22 and 23, 2018, committed any dischargeable violation of the No-Call/No-Show rule in MCCI's Attendance Policy. (SOF ¶20) For this reason, Smith is not and has never been "similarly situated" to Niles for purposes of her claims.

Defendant's Memorandum in Support, pp. 12-13. Again, as MCCI notes, Smith is the only employee that Niles claims was treated more favorably. While the two women were similarly situated in the generic sense–they were both female, pregnant and worked as CNAs–they were *not* similarly situated in the legal sense because Smith, unlike Niles, did not violate MCCI's no-call/no-show policy. MCCI insists that the evidence establishes that Niles was fired for violating that policy while Smith was permitted to return to her job because she had *not* violated it (or even been accused of doing so). Niles' argument ignores this crucial distinction altogether. The only "evidence" Niles offers on this point is her assertion that after she was terminated she exchanged text messages with another CNA named Erica and "learned that [Autumn] had been off on leave for two months and was not terminated, and Niles *believed* Defendant was playing favoritism because Autumn was White/Caucasian." Plaintiff's Response in Opposition, p. 7. Rather than present evidence to support her argument that Smith was treated more favorably, Niles simply rests on her conclusion that "[t]here is . . . evidence that MCCI allowed Autumn (White

coworker) to take time off work for pregnancy leave and to return to work–a much more favorable treatment than Niles received." Plaintiff's Response in Opposition, p. 11. Again, this statement is true, but it doesn't help Niles' case. Smith was allowed to return to work after she had her baby but Niles was not, so in that sense Smith had a more "favorable" outcome following her pregnancy leave. But this argument completely ignores the evidence that Smith did not violate the no-show/no-call policy while Niles did.[2] Niles presents no other evidence to support

---

[2] Even though Niles concedes that she violated the no-call/no-show policy (*see* Plaintiff's Response in Opposition, p. 6, "Ultimately, Niles admits that she was supposed to work on September 22 and September 23, 2018."), she argues that it "should not have applied to her." *Id.*, p. 7. Niles contends that "she should not have been scheduled to work on September 22 and 23 of 2018 because her doctor had taken her off of work by that time." Plaintiff's Response in Opposition, p. 8. But MCCI presents evidence that Niles' assertion regarding her doctor's order is misleading and even disingenuous. MCCI explains as follows:

> Niles "states" in her Response that she should not have been scheduled for the September 22 and 23, 2018 shifts, but then inexplicably supports this statement by citing to a doctor's note that was sent to MCCI in October, 2018, weeks after her termination, advising that Niles should not be working past October 15, 2018. (Dkt. 45, pp. 5 and 6). Niles then asserts, without any factual basis whatsoever other than her own testimony, that "the doctor's note was not sent because Niles was off the schedule after September 10, 2018 when she was terminated," followed by a further statement that Niles herself "questioned" why her own doctor sent the note in October. (Dkt. 45, p. 6) This reasoning is nonsensical because Niles claims that she did not even know that she was terminated until January 2019. (Dkt. 45, p. 8) Niles thus creates, and attempts to distract this Court with, her own confusion before, one sentence later, she "admits that she was supposed to be at work on September 22 and 23, 2018." (Dkt. 45, pp. 6-7).

Defendant's Reply (ECF No. 49), p. 4, n. 1. Indeed, Niles testified in her deposition that Dr. Rosemary Leitch wrote a letter dated October 15, 2018, indicating that Niles should be off work as of that date (which of course was *after* MCCI had terminated her for failing to show up for work in September). This is immaterial and irrelevant in light of Niles' sworn testimony:

> Q. So you were scheduled to work on September 22 and September 23 of 2018; is that fair?
>
> A. Yes.

her argument that she was treated less favorably than other similarly situated employees aside from Autumn Smith's alleged preferential treatment, which MCCI explains with evidence that Niles, but not Smith, violated a company rule. MCCI argues as follows:

> Since the adverse action MCCI took against Niles was to terminate her for violating its "no call, no show" policy on September 22 and/or 23, 2018, "similarly situated" employees are logically and legally those employees who also violated MCCI's "no call, no show" policy. As has long been established in the Seventh Circuit, "(s)imilarly situated employees must be 'directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations." *Naik v. Boehringer Ingelheim Pharms., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010). Again, Niles chose not to pursue any facts surrounding any such employees during an ample period of discovery in this matter. Although the burden of establishing her prima facie elements remains at all times on Niles, MCCI provided record evidence, through an Affidavit attached to its Memorandum, of twelve such individuals that MCCI terminated from April 2018 through January 2019 under the same "no call, no show" policy. (Dkt. 40-1, Ex. 2). Eight of these individuals were Caucasian, four were African American, and none were pregnant. (Dkt. 40-1, p. 5, ¶10). Niles did not, and could not, dispute these record facts relating to similarly situated individuals in her Response.
>
> Ignoring the record facts relating to actual "similarly situated" employees at MCCI, Niles continues to assert in her Response that Autumn Smith ("Autumn"), a white employee who was also pregnant at or around the same time as Niles was pregnant, was allowed to return to work after her pregnancy while Niles was not. Consistent with her approach of ignoring the reason why she herself was not allowed to return to MCCI, i.e., her termination for her "no call, no show" on September 22 and 23, 2018, Niles also ignores in her Response the lack of any

---

Q. And you do not–did not provide and did not have anyone provide any doctor's notes to MCCI indicating that you were taken off work on September 22 and 23 of 2018, did you?

A. No.

Niles Deposition (ECF No. 40-2), p. 114. Despite Niles' attempt to create confusion about doctors' notes and whether she should have been scheduled to work on those two days, she concedes in the end that she was on the schedule, did not show up for work, and did not provide MCCI with any doctor's note or excuse indicating that she should be off work on either September 22 or September 23.

record facts to suggest that Autumn was ever a "no call, no show" or otherwise ever did anything to merit her termination before returning to MCCI following her pregnancy leave. Instead and again, Niles attempts in her Response to support her claims by making a statement which is contrary to her own deposition testimony, disingenuously and improperly asserting that: As for Autumn (who was Caucasian and pregnant), Plaintiff *recalls that Autumn did not have a doctor's note.* (Dkt. 45, p. 7) [.] This assertion is flatly contradicted by Niles' own deposition testimony in which she admitted knowing nothing about Autumn's attendance record or what conversations Autumn may or may not have had with anyone about taking a leave of absence in connection with her pregnancy. (Dkt. 40-2, p. 142).[3]

---

[3] MCCI is correct that Niles' testimony regarding Autumn Smith reveals that Niles has no evidence that Smith was treated more favorably and, in fact, that Niles had no personal knowledge of Smith's employment record:

Q. What is your understanding as to your belief as to why Autumn was treated more favorably than you?

A. She got more chances than I did.

Q. What do you mean she got more chances?

A. To come to work and not be written–not be fired. I–she wasn't fired.

Q. Who was Autumn's supervisor?

A. I have no clue.

. . .

Q. What was Autumn's work experience with MCCI?

A. I have no clue.

Q. What was Autumn's attendance record with MCCI?

A. ***I don't know.***

Q. Did Autumn–do you have any knowledge as to any conversations that Autumn had with anybody at MCCI about leave requests?

A. No.

Even accepting Niles' statement above at face value despite the contradiction in her own deposition testimony, it at best establishes that in some unknown and undeveloped context Autumn did not have a doctor's note for something. It does not and cannot provide Niles with record evidence that similarly situated employees received better treatment than she did. And again, Autumn is not "similarly situated" to Niles as that concept has been consistently defined in Seventh Circuit and applied in this District in the Title VII discrimination context. Specifically, "[i]n a disparate discipline case, the similarly situated inquiry often hinges on whether co-workers engaged in comparable rule or policy violations and received more lenient discipline." *Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 262 (7th Cir. 2014) (citing *Coleman v. Donahoe*, 667 F.3d 835, 850 (7th Cir. 2012)); *see also Norwood v. E. Allen Cty. Sch.*, No. 1:15-CV-00249[], 2018 WL 4680008, at \*12 (N.D. Ind. Sept. 28, 2018), aff'd, 825 F. App'x 383 (7th Cir. 2020) (explaining that, in disciplinary cases in which a plaintiff claims to have been treated more harshly than a similarly situated employee, the plaintiff must normally show, among other factors, that the two employees "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them") (Collins, J.).

Based on the above, as well as the facts and arguments set forth in MCCI's Memorandum and Niles' own Response, it is clear that the record in this case contains no material evidence from which Niles could establish that MCCI treated Niles less favorably than any "similarly situated" employees. It is Niles' burden to produce some such evidence, and without it she cannot establish the fourth necessary element of her *McDonnell-Douglas* prima facie case of either race or pregnancy discrimination. As a result, summary judgment should be granted to MCCI.

Defendant's Reply in Support (ECF No. 49), pp. 7-9. As another district court explained:

"All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). "Its purpose is to eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Humphries v. CBOCS West, Inc.*, 474

---

Niles Deposition (ECF No. 40-2), pp. 141-142 (emphasis added). Niles' assertion that Smith was treated more favorably is, therefore, based only on her own speculation and conclusions about Smith's treatment, not on any admissible evidence.

F.3d at 405).

> "Although similarly situated employees 'need not be identical in every conceivable way,' they 'must be directly comparable to the plaintiff in all material respects.'" *Id.* (quoting *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365-366 (7th Cir. 2009)). "In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* (quoting *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d at 365). "But 'this is not a hard and fast test, and there is no magic to these considerations. In the employment discrimination context, the requirement to find a similarly situated comparator is really just the same requirement that any case demands–the requirement to submit relevant evidence.'" *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d at 369 (citing *Johnson v. Advocate Health and Hosps. Corp*, 892 F.3d at 895). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Id.* (citing *Johnson v. Advocate Health and Hosps. Corp*, 892 F.3d at 895; *see also Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007) ("The similarly-situated requirement . . . is a common-sense flexible inquiry that seeks to determine whether there are enough common features between the individuals to allow a meaningful comparison."). "Ultimately, plaintiff bears the burden of showing the individuals [s]he identifies are similarly situated." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 723-724 (7th Cir. 2018); *see also Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) ("[W]e hold that [the plaintiff] failed to meet her burden of establishing that [the co-worker] is a similarly situated employee.").

*Jean v. Indiana Dep't of Correction*, No. 1:19-CV-2005, 2021 WL 964287, at *3 (S.D. Ind. Mar. 15, 2021). Niles' attempt to characterize Smith as similarly situated fails because Smith did not "engage in similar conduct" given that Smith did not violate the no-call/no-show policy but Niles did. As MCCI states it, "[a]gain, the critical distinction between Niles and Smith is the undisputed evidence that Niles violated MCCI's strictly enforced Attendance policy and no-call/no-show rule on September 22 and 23, 2018, and the complete lack of any evidence whatsoever that Smith ever did." Defendant's Memorandum, p. 14. Accordingly, since Niles

cannot establish the fourth prong of her prima facie case for either race or sex discrimination, her claims fail and MCCI is entitled to summary judgment.

### B. Niles fails to establish that she was meeting MCCI's reasonable performance expectations or that MCCI's proffered, nondiscriminatory reason for firing her was pretextual.

MCCI argues that "Niles' overall lack of evidence of race or pregnancy/gender discrimination, together with her lack of evidence to support either the second or fourth elements of her *prima facie* case under *McDonnell Douglas*, should alone result in summary judgment for MCCI[.]" Defendant's Memorandum in Support, p. 13. MCCI further argues that "[e]ven assuming . . . that the Seventh Circuit's recent refinement of the summary judgment standard in employment discrimination cases somehow requires this Court's analysis to continue beyond this point, there are clearly no facts or bases upon which Niles can prove either that MCCI's decision to terminate her was motivated by her race or pregnancy or that its reasons for her termination were pretextual." *Id*.

MCCI contends that Niles was *not* satisfactorily performing her job at the time of her separation because she violated the company's no-show/no-call rule, which is also MCCI's explanation for Niles' separation from employment. For that reason, the second prong of a prima facie case of discrimination–whether the plaintiff was performing her job satisfactorily–merges with the issue of pretext. *See* Plaintiff's Response in Opposition, pp. 11-12 ("the *prima facie* case and pretext analyses often overlap, allowing a direct inquiry into pretext if the defendant offers a non-discriminatory reason for [its action]."); *Jean v. Indiana Dep't of Correction*, 2021 WL 964287, at *3 ("When a plaintiff claims that [s]he 'was disciplined more harshly than non-black employees who also violated the policy' (i.e., that an employer applied its legitimate expectations

in a discriminatory way) the second and forth prongs of the *McDonnell Douglas* framework merge, and the plaintiff doesn't 'have to show [she] was meeting the employer's legitimate expectations to establish a prima facie case of discrimination.' *Curry v. Menard, Inc*., 270 F.3d 473, 478 (7th Cir. 2001). In this context, the defendant's argument that the plaintiff didn't meet the defendant's legitimate expectations 'is more appropriately considered in [the court's] analysis of pretext.'*Id*. (citing *Vakharia v. Swedish Covenant Hosp*., 190 F.3d 799, 807 (7th Cir. 1999)).").

MCCI argues that Niles presents no evidence to show that its decision to terminate her was pretextual. MCCI recounts the circumstances leading up to Niles' termination as follows:

3. Plaintiff Mollie Niles . . . was hired by [Community Director and chief management official] [Tyler] Weilbaker as a part-time certified nursing assistant ("CNA") and began working as an "at will" employee at Lincolnshire Place in Fort Wayne, Indiana on or about July 26, 2018. (Ex. A, ¶5; Ex. B, Mollie Niles January 11, 2021 Deposition Transcript, 61:3-21, 63:5-10, and 145:3-7.)

4. During her employment at MCCI, Niles's supervisors were CD Weilbaker and MCCI's Director of Nursing Samantha Little ("DON Little"). (Ex. A, ¶8.)

. . .

5. Niles received and signed off on an acknowledgment that she received MCCI's Employee Handbook upon her hire on July 26, 2018. (Ex. A, ¶16 and Ex. 7 thereto; Ex. B, 63:19-64:1 and 221:11-19; Ex. C, Plaintiff's Responses to Defendant's Request to Admit No. 10.)

6. Niles also received and signed off on an acknowledgment that she received MCCI's Employment Policies, including its Attendance policy, when she began working at MCCI. (Ex. A, ¶16 and Ex. 8 thereto.)

7. MCCI's Attendance Policy states that "Good attendance is vital to the successful operation of any business operation, including Lincolnshire Place" and that employees are "expected to be at the job, on time, every day that" they are "scheduled to work." (Ex. A, ¶15 and Ex. 6 thereto; Ex. B, p. 146-148.)

8. The "Attendance" section of MCCI's Employee Handbook advises that "In the event you are unable to report to work…you must call your community director/designee three hours prior to the start of your scheduled shift." It further states the consequence for failure to do so as: **"Any employee who fails to report to work will be considered as voluntarily resigned."** (Ex. 5 to Ex. A.)

9. MCCI's Attendance Policy repeats the "Call In Procedure," which reinforces that employees must call in to their supervisor within three hours of the start of their shift to report for every day they will be absent from scheduled work. (Ex. A, ¶15 and Ex. 6 thereto.) This "Call In Procedure" further requires employees to "provide a doctor's note whenever you are absent due to illness or injury." (Ex. A, ¶15 and Ex. 6 thereto; Ex. B, 126:24-127:3.)

10. Included in MCCI's Attendance Policy is a "No Call/No Show" rule which mirrors the stated consequence in the Attendance section of MCCI's Employee Handbook of not showing up or calling off from a schedule shift. It states:

> If you fail to arrive for work when scheduled and fail to notify your supervisor directly within three hours of the start of your scheduled shift, you will be considered a "no call/no show for that day. This is a serious attendance policy violation and will not be tolerated from any employee. Any employee who fails to report to work without providing the required notice will be considered as having voluntarly resigned.

(Ex. A, ¶¶14-15 and Exs. 5 and 6 thereto; Ex. B, p. 147:6-148:22.)

. . .

11. MCCI's September 2018 schedule shows that Niles was scheduled to work at MCCI on September 22 and 23, 2018. (Ex. A, ¶17 and Ex. 8 thereto; Ex. B, 114:16-19.)

12. Niles admitted that she knew that MCCI had a September 2018 work schedule, that she was supposed to look at the schedule to find out when she was scheduled to work, and that, according to MCCI's September 2018 work schedule, she was scheduled to work on September 22 and 23, 2018. (Ex. B, 114:3-24.)

13. Niles did not show up for her scheduled shifts on September 22 and 23, 2018, has no evidence that she called-in her absence for these scheduled shifts and did not provide MCCI with any documentation of any illness or cause for her absence on September 22, and 23, 2018. (Ex. B, 114:3-24.)

14. Niles was terminated by CD Weilbaker on September 24, 2018[,] after she was deemed, in accordance with MCCI's attendance policy, to have voluntarily resigned. (Ex. A, ¶6 and Ex. 1 thereto.) MCCI's termination document for Niles was signed by CD Weilbaker and DON Little. (Ex. A, ¶9 and Ex. 1 thereto.)

. . .

15. Niles' termination from MCCI was consistent with MCCI's termination of other employees who failed to appear at work when they were scheduled to work. From April 2018 to January 2019, MCCI terminated 12 other employees under its Attendance policy for being no call/no shows at work. Eight of these were employees were Caucasian, four were African American and none were pregnant. (Ex. A, ¶10 and Group Ex. 2 thereto.)

. . .

16. Niles regards herself as multi-racial in that she is half-black and half-white. (Ex. B, 23:5-12.)

17. Niles is female and alleges that she was pregnant both at the time of her hire and at the time of her termination from MCCI. (Dkt. 21 ¶8; Ex. B, 77:23-24, 79:1-80:19.)

18. No one at MCCI made any direct statements that Niles alleges or believes suggested any type of discrimination against her. (Ex. B, 78:21-24.)

Defendant's Memorandum in Support (ECF No. 40), pp. 2-5 (paragraph numbers and boldface in original).

Evidence of pretext is "evidence that the employer's proffered reason for the discharge is 'patently inconsistent with the evidence before the court.'" *Smeigh v. Johns Manville, Inc*., No. 1:09-CV-0414, 2010 WL 3781492, at *6 (S.D. Ind. Sept. 22, 2010), aff'd, 643 F.3d 554 (7th Cir. 2011) (quoting *Mack v. Great Dane Trailers*, 308 F.3d 776, 784 (7th Cir. 2002) (in turn quoting *Markley Enters., Inc. v. Grover*, 716 N.E.2d 559, 565 (Ind.Ct.App.1999))). "'Pretext means a dishonest explanation, a lie rather than an oddity or an error.'" *Id.* (*quoting O'Regan v. Arbitration Forums, Inc*., 246 F.3d 975, 983 (7th Cir. 2001)). "[T]he Court must analyze whether

or not [defendant's] proffered explanation is a lie to cover up unlawful retaliation." *Id*. A plaintiff must present evidence that the defendant's explanation is unworthy of credence and that her race or sex was a determinative factor behind the defendant's adverse action. *See Maguire v. Marquette University*, 814 F.2d 1213, 1216-18 (7th Cir. 1987); *Sherkow v. Wisconsin*, 630 F.2d 498, 502 (7th Cir. 1980) (both stressing that the plaintiff must show not only a false reason but also a causal chain in which race or another forbidden criterion plays a dispositive role). "A district judge does not sit in a court of industrial relations. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII and § 1981 do not interfere. . . . The employee must show that race is the dispositive factor. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 462 (7th Cir. 1986)." *Id.* at 560-61.

MCCI argues that Niles' evidence on the issue of pretext is insufficient. MCCI states that "Niles acknowledged during her deposition that the only other reasons she herself [sic] believes her termination was discriminatory on any basis were that: (1) Niles asked CD Weilbaker at the time of her hire if she could come back after she delivered her baby and he said 'yes' but she wasn't ultimately allowed to return; (2) Niles received a call from an alleged MCCI DON named Deb Meyer ('Meyer') in October, 2018 asking when she would be returning to work but when she tried to return she was told she had been terminated; and (3) Smith had been allowed to return to work following her pregnancy." Defendant's Memorandum, p. 14.

MCCI insists that Niles' argument regarding pretext is based on conclusory allegations and a twisting of the facts, and argues that "Niles is grasping at red herrings and mischaracterizing immaterial facts in an attempt to create confusion and paint it as pretext." *Id.*,

p. 10. As MCCI points out, "[e]ven if true, both the fact that Smith was allowed to return to MCCI following her pregnancy and any conversation that CD Weilbaker may have had with Niles at the outset of her employment affirming that she would be allowed to return to work after delivering her baby are, if anything, evidence that CD Weilbaker–the decisionmaker in Niles' termination–harbors no discriminatory animus toward pregnant employees." Defendant's Memorandum, p. 14. Furthermore, argues MCCI, "[a]ssuming that the conversation between CD Weilbaker and Niles ever even happened, Niles' September 22 and 23, 2018[,] termination offense was clearly an intervening event that would not have been in CD Weilbaker's contemplation at the time he made any such statement at the beginning of Niles' employment on or about July 26, 2018. Regardless, neither Niles' first nor her third reasons for believing that MCCI discriminated against her either legally or even rationally support such a belief." *Id*.

Then there is Niles' allegation, made during her deposition, that in October of 2018 she received a phone call from MCCI Director of Nursing, Deb Meyer, asking when Niles would be returning to work. MCCI states that it "first employed Meyer on or about August 22, 2019[,] to work as a licensed practical nurse/floor nurse at Lincolnshire Place, but this was nearly a year after Niles' termination and Meyer neither worked at Lincolnshire Place at any time when Niles worked there nor was she every employed as a DON." Defendant's Memorandum, p. 6 (citing Weilbaker Aff., ECF No 40-1, ¶ 11). In her response brief Niles continues to insist that "Deb Meyer/DON asked Niles for a doctor's note on October 15, 2018[,] in a telephone conversation." Plaintiff's Response, p. 6. The long and short of it is that Niles contends that an MCCI DON

called her on or about October 15, 2018, asking when she would be returning to work.[4] If Niles

was fired in September for failing to show up for work, why did MCCI (through some

unidentified DON) contact her in October to ask her when she would be returning to work? Niles

argues that this fact illustrates "that MCCI can never get its story straight." *Id*., p. 12. Niles

argues that MCCI's proffered nondiscriminatory explanation for its decision was pretextual

because MCCI offered what Niles contends are conflicting explanations about exactly when

Niles was terminated and also whether she was terminated or resigned. Here is how Niles' theory

goes:

> Depending on which story you believe, MCCI contended that Niles 'resigned' on
> September 10, 2018, but then terminated her on either September 24, 2018[,] or
> September 29, 2018. This smells very fishy. Why would a company fire an

---

[4] Niles' recollection of this alleged phone conversation was limited:

Q. Did anyone tell you or request a doctor's note that led to the one that was
generated on October 15 of 2018?

A. Yes.

Q. Who asked for that to your understanding?

A. The DON did.

Q. You're stating that Deb Meyer asked you for a doctor's note October 15, 2018?

A. Yeah, that I was no longer going to be there until I have the baby, yes.
. . .

Q. Okay. When did this conversation with Deb Meyer take place?

A. Sometime in August, maybe around October 1st or before. Before–either
beginning of October or before October. I don't recall. I'm just giving you an
estimate.

Niles Deposition (ECF No. 40-2), p. 103.

employee who had already resigned? And assign multiple dates for the termination?

The dishonesty of MCCI's decision is evident by the following:

> i) Initially, MCCI claims that Niles resigned as of September 10, 2018 (see phone app printout attached to Plaintiff's Affidavit);
>
> ii) On another occasion in a discovery response, MCCI claimed Niles was terminated on September 24, 2018 after she voluntarily resigned (Def. Ans. Int. No. 3);
>
> iii) In the Employee Warning Notice Form dated September 24, 2018, MCCI claimed that Niles was also fired on September 29, 2018;
>
> iv) In an Employee Warning Notice Form dated September 24, 2018, MCCI claims that Niles was terminated for no-call/no-show and claimed to have left messages for Niles to come in to work, and then claims Niles was terminated as of September 29, 2018 (all of which Niles denies).

Plaintiff's Response, p. 11. The foundation for Niles' theory is the "phone app printout" attached to her affidavit (ECF No. 46-1, p. 5).

MCCI is correct when it states that "Niles is grasping at red herrings and mischaracterizing immaterial facts in an attempt to create confusion and paint it as pretext." Defendant's Reply (ECF No. 49), p. 10. That document, which Niles obtained by visiting the website www.PayChex.com, states that Niles was hired by MCCI on July 26, 2018, that she was "Terminated Sep[t.] 10, 2018," and that the "Reason" for her termination was that she "Resigned." *Id*. Niles argues that this evidence shows that MCCI gave conflicting reasons for her separation from employment as well as different dates for when that separation occurred. Niles states that "[o]ne cannot help but be amused by watching MCCI thread the needle between 'resignation' and 'termination' and the variable dates of each." Plaintiff's Response, p. 12.

Therefore, according to Niles, there is a disputed issue of material fact regarding pretext and therefore summary judgment should be denied.

In fact, it is Niles who is attempting to thread a needle here, but her argument is unavailing because, as MCCI asserts, it at best misconstrues and at worst misrepresents the evidence on which it is based. MCCI explains as follows:

In her Response, Niles places great emphasis on a record she found on the Paychex application that MCCI makes available to its employees. According to her own deposition testimony, Niles consulted this Paychex application only after she learned in January, 2019 that she had been terminated from her MCCI employment. (Dkt. 40-2, p.p. 160, 162 and 165). At that time, Niles discovered that the Paychex application showed that she had "resigned" on September 10, 2018 (the "Paychex Record"). (Dkt. 40-2, p.p. 160, 161 and 162). During discovery in this case, Niles used this Paychex Record as a basis for claiming that MCCI "backdated" her termination to September 10, 2018. (Dkt. 40-4, p. 3, Answer to Interrogatory 2). Now, Niles attempts to use the Paychex Record to disingenuously claim in her Response that:

• "Initially, Plaintiff *was told* that she was terminated from Defendant MCCI of Indiana, Inc. ("MCCI") on September 10, 2018;" and

• "The doctor's note *was not sent because* Niles was off the schedule after September 10, 2018 when she was terminated."

(Dkt. 45, p.p. 5, 6).

Clearly, given Niles' own deposition testimony establishing that she herself [sic] was unaware of the Paychex Record until she started investigating her termination when she sought to return to MCCI in January, 2019, it is pure sleight-of-hand to state in her Response that she "was told" that she was terminated on September 10, 2018 or to suggest that on the basis of this information her doctor's note "was not sent" because she was off the MCCI schedule after that date. (Dkt. 45, pp. 5 and 6). This also flies in the face of Niles' own deposition testimony and/or Response acknowledgments that she was, in fact, on the MCCI schedule on September 22 and 23, 2018 and claims to have called in her absence on the first of those two days. (Dkt. 40-2, pp. 114 and 124; Dkt. 45, pp. 6-7). Niles' inclusion of such statements in her Response reflects a deliberate attempt to suggest connections and the existence of facts which are simply not part of the record in this case.

Niles had ample opportunity throughout the course of discovery in this matter to pursue the reasons for, the meaning of, and the circumstances surrounding the creation of the Paychex Record showing that she resigned on September 10, 2018. She chose not to do so –she did not submit any written discovery on this topic, nor did she request to take any depositions of any MCCI employees and/or decisionmakers. . . . If Niles had done so, she would have learned that after any MCCI employee's termination from employment, MCCI administratively characterizes the termination in the Paychex application in accordance with MCCI's policies and pegs the termination to the date of the last payroll period in which the employee received a paycheck. Supplementary Affidavit of Tyler Weilbaker, Ex. E, ¶¶ 2-7. The Paychex application is not used, nor does the record here (including Niles' own testimony) reflect that it was used here to communicate the termination to the employee. MCCI notes that it is not its burden to produce such facts and does not believe they are even material to the issue of summary judgment, but does so here for the sake of explanation in light of Niles' arguments based upon her own speculations about them.

. . .

Whatever confusion the Paychex Record may have caused for Niles, whether genuine or feigned for the purpose of supporting her claims, it cannot create a genuine issue of material fact that she was adhering to MCCI's attendance policies on September 22 and 23, 2018, and therefore performing to MCCI's legitimate expectations at the time of her termination.

Defendant's Reply, pp. 5-6. MCCI elaborates as follows:

Although Niles' lack of evidence from which to establish two of her four required prima facie elements under *McDonnell-Douglas* should itself be fatal to her claims, her inability to establish pretext requires summary judgment regardless. There is no dispute that MCCI recorded Niles' termination on an "Employee Warning Notice Form" dated "9/24/18" on which it was noted that she was being terminated for "NCNS 9/22/18, 9/23/18" due to "no call no show" (the "Termination Form"). (Dkt. 40-1, Ex. 1) The Termination Form includes a place for an "Employee Signature." *Id*. The Termination Form also includes a written notation of an attempt made on 9/24/18 to contact Niles to obtain that signature where it is written "Admin and DON called Mollie to come in to do write up/termination. Employee did not answer after multiple attempts. 9/24/18." *Id.* In addition, the Termination Form has a written notation of a further "Update" on attempts to contact Niles, stating "DON called employee left Message to come in. Employee did not call back nor provide documentation of illness. Termination of employment 9/29/18." *Id*. The Termination Form was twice signed and reaffirmed by MCCI management, once on 9/24/18 and once on 9/29/18 after MCCI made

two unsuccessful attempts to communicate with Niles about her termination. Id. As set forth in MCCI's Memorandum, and not disputed in Niles' Response, MCCI's policies relating to Attendance specifically explain that employees who are "no call, no show" will be deemed to have "voluntarily resigned" their employment. (Dkt. 40-1, Ex. 5, p. 28).

Against this straightforward, contemporaneously created documentary evidence of what happened, why, and when in connection with Niles' termination from MCCI, Niles claims that the fact that there are two separate dates (9/24/18 and 9/29/18) noted on the Termination Form, together with her subsequent discovery of the Paychex Record showing that she "resigned" as of 9/10/18, establishes evidence that MCCI's reasons for terminating her were really pretext for race and pregnancy discrimination. Niles is grasping at red herrings and mischaracterizing immaterial facts in an attempt to create confusion and paint it as pretext. Again, and as noted earlier, Niles testified at her deposition that she did not herself become aware of the Paychex Record until after she became aware of her termination. Nevertheless, in a further disingenuous attempt to cast the Paychex Record, together with the two dates noted in the Termination Form for when MCCI reached out to Niles, as evidence of the "dishonesty of MCCI's decision," Niles makes the following untrue and misleading statement in her Response:

> • Initially, *MCCI claims* that Niles resigned as of September 10, 2018" (see phone app printout attached to Plaintiff's Affidavit)

(Dkt. 45, p. 11) (emphasis added).

Never in discovery and nowhere in the record of this matter has MCCI ever claimed that Niles resigned on September 10, 2018. MCCI takes at face value that in January, 2019 Niles saw and captured an image of the Paychex Record, and that it speaks for itself. No fact suggests, however, that the Paychex Record was ever used by anyone to speak for MCCI about either the date or nature of Niles' separation from her MCCI employment in September, 2018. These official communications, or attempted communications, are fully reflected on MCCI's own Termination Form. (Dkt. 40-1, Ex. 1). The fact that the Paychex Record reflects that Niles "resigned" is consistent with the fact that MCCI, according to its own policies, regards employees terminated for "no call, no show" as having "voluntarily resigned" their employment. (Dkt. 40-1, Ex. 5, p. 28). The fact that the Paychex Record shows September 10 for Niles' separation from employment simply reflects the last payroll period in which she was paid. (Ex. E, ¶¶5-7).

Given that Niles made no effort in discovery to determine or reveal any facts or circumstances surrounding how or why the Paychex Record was generated, Niles

can point to no facts from which to legally establish that the Paychex Record has
any meaning or relationship to MCCI's September 24, 2018 termination decision
at all, much less that it establishes pretext. The fact that MCCI reaffirmed its
September 24, 2018 termination decision on September 29, 2018 after trying
again to reach Niles, but not having heard back from her, also cannot establish
pretext. (Dkt. 40-1, Ex. 1). If anything, it establishes the lengths MCCI went to in
order to connect with Niles regarding her "no call, no show." *Id*.

*Id*., pp. 9-11. MCCI is correct that Niles misconstrues or mischaracterizes the evidence–that is,

the documents related to her termination–in an attempt to create a fact issue regarding pretext.

In the end, Niles fails to present sufficient evidence (*any* evidence, in fact) that other

employees not in her protected classes were treated more favorably, that she was performing her

job to MCCI's reasonable expectations, or that MCCI's proffered nondiscriminatory explanation

for its decision to fire her was pretextual. Her claims are based only on the following assertions:

1) She was told when she was hired on July 26, 2018, that she would be allowed to return to

work after giving birth but was not allowed to; 2) Autumn Smith, who was also pregnant and

who was white, was allowed to return after being on pregnancy leave; and 3) her conclusion that

the paperwork related to her separation from employment shows that MCCI cannot "get its story

straight" about the date or reason (resignation or termination) she was fired. Niles fails to

establish that Smith (or any other employee) was treated more favorably because it is undisputed

that Smith was never alleged to have violated the no-call/no-show rule as was Niles. Niles fails

to establish that her job performance was meeting MCCI's reasonable expectations in that she

concedes that she was scheduled to work on September 22 and 23, 2018, but did not show up for

work on either day. Niles also fails to present evidence to refute MCCI's proffered

nondiscriminatory explanation for its decision to terminate her (or deem her to have resigned due

to her failure to report for work). Because she has no evidence of pretext, Niles attempts to create

an issue of pretext out of whole cloth by concluding–based on her interpretation of the Paychex record and her Termination Form–that MCCI must have be lying about when and why she was fired. But as stated above, evidence of pretext is "evidence that the employer's proffered reason for the discharge is 'patently inconsistent with the evidence before the court.'" *Smeigh v. Johns Manville, Inc.*, No. 1:09-CV-0414, 2010 WL 3781492, at *6 (S.D. Ind. Sept. 22, 2010), aff'd, 643 F.3d 554 (7th Cir. 2011) (quoting *Mack v. Great Dane Trailers*, 308 F.3d 776, 784 (7th Cir. 2002) (in turn quoting *Markley Enters., Inc. v. Grover*, 716 N.E.2d 559, 565 (Ind.Ct.App. 1999))). "'Pretext means a dishonest explanation, a lie rather than an oddity or an error.'" *Id.* (*quoting O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001)). Niles presents no evidence to refute MCCI's explanation; instead, she offers an unsupported, conclusory and clumsy theory that she claims demonstrates that MCCI gave conflicting explanations about the date of her termination and the reason therefor. In fact, as MCCI explains, the documents on which Niles' argument is based do not contradict or conflict with the company's explanation, despite her attempt to confuse the facts. Niles does not dispute that she was scheduled to work on September 22 and 23, 2018, and that she did not show up on those days. MCCI fired Niles for failing to report to work.

MCCI is entitled to summary judgment on Niles' claims because the evidence she put forth fails to meet the summary judgment or *Ortiz* standards of review. "Summary judgment is a critical moment for a non-moving party. It must 'respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893-94 (7th Cir. 2018) (quoting *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir.

2017)). "Inferences supported only by speculation or conjecture will not suffice." *Id*. (citing *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721-22 (7th Cir. 2018)). "Neither will the mere scintilla of evidence." *Id*. (citing *Grant*, 870 F.3d at 571). On summary judgment this Court must decide "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Johnson*, 892 F.3d at 893-94 (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . . Relevant evidence must be considered and irrelevant evidence disregarded." *Id*. In this instance a reasonable jury could not conclude, based on the scant evidence and unsupported, conclusory arguments Niles presents, that her race or sex was the reason she was fired. Lacking such evidence, Niles' attempts to defeat MCCI's well-supported motion with "[i]nferences supported only by speculation or conjecture [,which] will not suffice[]" to overcome summary judgment. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893-94 (7th Cir. 2018) (citing *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721-22 (7th Cir. 2018)).

## CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment filed by Defendant MCCI of Indiana, LLC (ECF No. 39) is GRANTED.

Date: July 12, 2021.

  /s/   William C. Lee
William C. Lee, Judge
U.S. District Court
Northern District of Indiana